JUN 24 2022 PM 12:02
FILED - USDC - BPT - CT

**LARA SHALOV MEHRABAN**
**ACTING REGIONAL DIRECTOR**
Sheldon L. Pollock
Steven G. Rawlings
Lee A. Greenwood
Philip A. Fortino
Megan R. Genet
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
212-336-1060 (Greenwood)
GreenwoodL@sec.gov

3:22mc52 (SALM)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

Plaintiff,

-against-

**STRAIGHTPATH VENTURE PARTNERS LLC,**
**STRAIGHTPATH MANAGEMENT LLC, BRIAN**
**K. MARTINSEN, MICHAEL A. CASTILLERO,**
**FRANCINE A. LANAIA, and ERIC D.**
**LACHOW,**

Defendants.

---

**COMPLAINT**

**22 Civ. 3897**

**JURY TRIAL DEMANDED**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants StraightPath Venture Partners LLC (the "SP Fund Manager"), StraightPath

Management LLC (the "SP Adviser"), Brian K. Martinsen ("Martinsen"), Michael A. Castillero

("Castillero"), Francine A. Lanaia ("Lanaia"), and Eric D. Lachow ("Lachow") (collectively,

"Defendants"), alleges as follows:

**SUMMARY**

1.      The Commission brings this emergency action to halt an ongoing fraud by

Defendants in connection with their illegal sales of unregistered securities in investment vehicles that

purportedly provided access to highly-coveted shares of private companies that may hold an initial public offering ("IPO").  But, these investment vehicles were a fraud—they did not own all the private company stock Defendants said they did, the investors paid exorbitant, undisclosed fees that allowed Defendants to pocket tens of millions of dollars, and Defendants improperly commingled investor funds and made Ponzi-like payments.

2.      From November 2017 through February 2022, Defendants raised at least $410 million from more than 2,200 investors located across the country and around the world, including in this District.  In exchange for their investments, investors received securities—interests in a subdivision ("Series") of one of nine private investment funds (an "SP Fund").

3.      Through both written materials and their vast network of sales agents, Defendants represented to investors that their investments would be directed to a specific Series that purportedly owned a specific number of shares of a specific private company that had the potential to undertake an IPO ("Pre-IPO Shares").  Defendants then told investors that their investment corresponded to a specific number of Pre-IPO Shares held by that Series.  In essence, Defendants pitched the investment as a way for retail investors to own potentially lucrative, difficult-to-find Pre-IPO Shares that could not yet be purchased on a public stock exchange.

4.      Contrary to these representations, however, Defendants often were unable to obtain the number of Pre-IPO Shares they either claimed to already have or needed to back the interests they sold to investors.  And, rather than return the money investors paid them, Defendants kept it for themselves and continued to solicit new investors.

5.      Defendants also repeatedly told investors that each Series would be kept separate from all other Series, thus (in theory) protecting their investments from losses from another Series backed by other Pre-IPO Shares that were less profitable.  But instead, Defendants freely commingled investor funds, frequently transferring monies invested in one SP Fund to other SP

Funds or to the SP Fund Manager in order to make purchases of Pre-IPO Shares or Ponzi-like payments back to earlier investors who wanted their money back.

6.     All the while, Defendants profited handsomely from their fraudulent scheme.  Even as they told investors they were charging no upfront fees (or had waived the fees they could have charged), Martinsen, Castillero, Lanaia, and Lachow paid themselves more than $75 million and their sales agents nearly $48 million.

7.     Defendants also concealed from investors the continuing roles of Castillero and Lanaia, two of the three founders, who were effectively barred from the brokerage industry but who operated behind the scenes to run the SP Funds and further the fraud.  And, when the Commission staff sought copies of the emails of sales agents during its investigation, Castillero and Martinsen intentionally deleted them to avoid implicating themselves.

8.     In addition to the fraud the perpetrated on investors, Defendants violated the securities and broker-dealer registration provisions of the securities laws.  None of the interests in the SP Funds were registered with the Commission and no exemption from registration applied to these securities offerings because, among other reasons, Castillero—a founder of the SP Fund Manager and the head of its salesforce—was barred from the brokerage industry.  And, Defendants ran an unregistered broker-dealer through their use of sales agents (including Lachow) who were not licensed brokers and to whom they paid commissions.

9.     Emergency relief is necessary to protect investors in the SP Funds, which currently hold substantial cash and securities with an estimated value of more than $200 million.  In particular, an asset freeze and receiver are necessary to prevent the further dissipation of assets and to ensure that an independent fiduciary takes over the management of the SP Funds, the SP Fund Manager, and the SP Adviser.  Only a court-appointed receiver will be able to unwind Defendants'

commingling, identify the full extent of Defendants' fraud, and marshal investor assets in order to propose an equitable distribution plan.

## VIOLATIONS

10.     By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Sections 206(1), 206(2), 206(3), 206(4), and 207 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

11.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)]; Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

13.     The Commission seeks a final judgment:  (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section

21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

(d) ordering any other and further relief the Court may deem just and proper.

14.     To maintain the status quo and preserve assets sufficient for Defendants to pay

disgorgement, prejudgment interest, and civil penalties in accordance with any final judgment of this

Court, the Commission further seeks emergency relief during the pendency of this action including:

(a) temporarily and preliminarily enjoining Defendants from violating the federal securities laws and

rules this Complaint alleges they have violated; (b) freezing the assets of the SP Fund Manager, the

SP Adviser, Martinsen, Castillero, and Lanaia; (c) appointing a receiver over the SP Funds, the SP

Fund Manager, the SP Adviser, and the frozen personal assets of Martinsen, Castillero, and Lanaia;

(d) enjoining the filing of new bankruptcy, foreclosure, receivership or other actions against the SP

Funds, the SP Fund Manager, and the SP Adviser; (e) requiring the SP Fund Manager, the SP

Adviser, Martinsen, Castillero, and Lanaia to provide a sworn accounting; (f) granting expedited

discovery; and (g) preventing Defendants from destroying, altering, or concealing documents or

other evidence or from directing others to do so.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a)

[15 U.S.C. § 77v(a)]; Exchange Act Section 27 [15 U.S.C. § 78aa]; and Advisers Act Section 214(a)

[15 U.S.C. § 80b-14(a)].

16.     Defendants, directly and indirectly, have made use of the means or instrumentalities

of interstate commerce or of the mails in connection with the transactions, acts, practices, and

courses of business alleged herein.

17.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)],

Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

From 2017 until 2021, the primary office for the SP Fund Manager and the SP Adviser was in lower

Manhattan, which Castillero and, at various times, Martinsen, Lanaia, and Lachow, used to conduct the business of these entities. Additionally, certain acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including calls and emails to prospective investors in the SP Funds as well as sales of Series interests in the SP Funds to at least 94 investors located in Manhattan and elsewhere in this District.

## DEFENDANTS

18.    The **SP Fund Manager** is a Delaware limited liability company incorporated on May 11, 2017, which served as the owner and manager of each of the SP Funds. From 2017 until mid-2021, the SP Fund Manager's office was in Manhattan; in mid-2021, it moved its office to Jupiter, Florida. The SP Fund Manager has never been registered with the Commission as a broker-dealer.

19.    The **SP Adviser** is an investment adviser incorporated in Delaware as a limited liability company on May 11, 2017, which served as the investment adviser to each of the SP Funds and as the managing member of the SP Fund Manager. Like the SP Fund Manager, the SP Adviser's office was in Manhattan until mid-2021, at which time it moved its office to Jupiter, Florida. The SP Adviser has never been registered with the Commission as a broker-dealer.

20.    **Castillero**, age 44, resides in Palm City, Florida. Castillero is one of the three founders and beneficial owners of the "StraightPath" suite of entities and funds. From their inception in 2017 until early February 2019, on paper, Castillero was the majority beneficial owner of the SP Adviser and the SP Fund Manager. On February 6, 2019, Castillero was permanently barred from associating with any member of the Financial Industry Regulatory Authority ("FINRA") for refusing to appear for on-the-record testimony in December 2018 in connection with a FINRA investigation into allegations that, among other things, Castillero engaged in unauthorized trading in a customer's account when he had been working at a broker-dealer. Between 2002 and 2017, Castillero was a registered broker at four different broker-dealers and held Series 7, 24, 63, and 65

6

securities licenses.  Castillero has been the subject of at least 12 customer complaints from his time

in the securities industry, all of which alleged fraud or unsuitable investment recommendations.

21.     **Martinsen**, age 45, resides in Saint James, New York.  Another one of the three

founders and beneficial owners of StraightPath, Martinsen became the purported majority owner of

both the SP Fund Manager and the SP Adviser in early February 2019, when Castillero purportedly

transferred his interests in those companies to Martinsen.  Martinsen is not currently registered with

the Commission as a broker.  From 1996 until April 2020, Martinsen was a registered broker at 13

different broker-dealers and held Series 7, 24, 63, and 65 securities licenses.  Martinsen has been the

subject of at least seven customer complaints from his time in the securities industry, which alleged

various types of fraud or unsuitable investments.

22.     **Lanaia**, age 57, resides in Fort Salonga, New York.  Lanaia is the third founder and

beneficial owner of the StraightPath entities, although she has persistently described herself as a

mere "consultant."  Lanaia has filed two voluntary Chapter 13 bankruptcy petitions; the first was

filed on September 8, 2017, and dismissed on March 26, 2018, while the second was filed on May

31, 2018, and dismissed on October 3, 2019.  Lanaia was suspended from association with any

FINRA member between January 16, 2018, and April 16, 2018, for failing to properly disclose three

outstanding civil judgments against her totaling more than $286,000 on her Form U4; on October

29, 2018, that suspension became a permanent bar.  Previously, between 1989 and 2017, Lanaia was

a registered broker at six different broker-dealers and held Series 7, 24, and 63 securities licenses.

Lanaia has been the subject of at least five customer complaints from her time in the securities

industry, which alleged fraud or failure to supervise other brokers.

23.     **Lachow**, age 47, resides in Parkland, Florida.  From inception until in or around

September 2021, Lachow served as the nominal manager of the SP Fund Manager, and, in that

capacity, signed documents and sent emails at the direction of the three founders.  After Castillero

"resigned" in February 2019, Lachow became the managing member of the SP Adviser and 1

percent owner of both the SP Adviser and the SP Fund Manager. Lachow has not been registered

with the Commission as a broker since 2013. At various points in time between 1997 until 2013,

Lachow was a registered broker with nine different broker-dealers and held Series 7, 9, 10, 24, 53,

63, and 65 securities licenses.

## FACTS

### I.   STRAIGHTPATH'S SECURITIES OFFERINGS

24.     Castillero, Martinsen, and Lanaia are veterans of the securities industry. They met

while working together as licensed brokers at Commission-registered broker-dealers. Martinsen and

Lanaia worked together beginning in 2006, while Castillero overlapped with them at various points

beginning in 2012.

25.     In May 2017, Castillero, Martinsen, and Lanaia founded StraightPath, with an initial

advance of $21,000 from Lanaia.

26.     In theory, StraightPath's business model was to acquire Pre-IPO Shares and then sell

to investors an interest in an SP Fund Series that owned those Pre-IPO Shares ("Interests").

27.     Pre-IPO Shares generally are held by early stage investors and company employees

and their family members and are not widely available to the investing public.

28.     Pre-IPO Shares are attractive to investors due to the potential for high returns in the

event the company does have an IPO and there is high demand for its shares, allowing the shares to

be sold above their pre-IPO price.

29.     Together, Castillero, Martinsen, and Lanaia established (a) the SP Adviser, which

would be the investment adviser to the SP Funds, (b) the SP Fund Manager, which would acquire

the Pre-IPO Shares, allocate them by Series, and then sell Series Interests to investors, and (c) over

time, nine SP Funds, each of which was organized as a Delaware series limited liability company.

8

30.     Between November 2017 and February 2022, the SP Fund Manager sold Series
Interests to more than 2,200 investors located in 49 states, Washington, D.C., and Puerto Rico.

31.     At least 94 of these investors are located in Manhattan and in this District.

32.     The SP Fund Manager also sold Series Interests to investors located in at least 13
other countries.

33.     From November 2017 through February 2022, Defendants raised at least $410
million from investors for the SP Funds.

34.     Prospective investors in each of the SP Funds were provided with similar offering
documents containing substantially similar language—a private placement memorandum ("PPM"),
an operating agreement for the relevant SP Fund contained in the PPM, a subscription agreement, a
purchaser questionnaire, and an additional letter and "pitchbook" that provided more information
about the pre-IPO company in which investors were led to believe they were investing.

35.     Lanaia drafted the PPMs.

36.     Lachow is named in each of the PPMs as part of the management of the SP Fund
Manager.  The PPMs tout Lachow's background and experience in the securities industry, including
an "active Investment Advisor License (Series 65)," and provide his contact information for
investors who may have questions.

37.     Beginning with SP Fund 3, the PPMs also listed Martinsen as the "director" of both
the SP Fund Manager and the SP Adviser, and similarly tout his background and experience in the
securities industry.

38.     None of the PPMs refer to either Castillero or Lanaia at all.

39.     The PPMs disclosed to investors that the SP Adviser "will be responsible for
investment of the [SP] Fund's assets," which meant that it will "(i) originate, analyze, and
recommend investment opportunities to the [SP] Fund that are consistent with the purpose and

investment focus of the [SP] Fund, (ii) structure investments, (iii) identify funding sources for Portfolio Companies, (iv) supervise the preparation and due diligence review of documentation relating to the acquisition, financing, and disposition of investments, (v) monitor investments, and (vi) provide such other services related thereto as the [SP Fund] Manager may reasonably request."

40.     With respect to the SP Fund Manager, as described in each of the PPMs, its primary duty was to "establish various [Series] for the purpose of making separate and distinct direct, indirect and secondary venture capital or growth equity investments in various leading seed-stage, early-stage, developmental-stage and later-stage private companies."

41.     According to the PPMs, each SP Fund was as a series limited liability company that was divided into segregated parts (a Series) in which investors could purchase Interests.

42.     Each Series purportedly held a set number of Pre-IPO Shares, or rights to Pre-IPO Shares, of a particular pre-IPO company.

43.     By purchasing Interests in a particular Series, an investor could gain a beneficial interest in a proportional number of the underlying Pre-IPO Shares held by the Series.

44.     For example, if a Series owned 100,000 Pre-IPO Shares of a particular pre-IPO company, an investor who purchased 2 percent of the Series would own an interest in 2,000 Pre-IPO Shares of that company.

45.     In practice, Defendants and their sales agents presented these offerings as if they were selling the Pre-IPO Shares to the investor—that is, they quoted prospective investors a price per share, the investor specified the number of shares they wished to own, and investors were then told that their capital contribution reflected a number of shares at that price per share.

46.     On its website, the Fund Manager pitches its offerings as a way for small investors to "gain access to pre-IPO investing opportunities at privately held companies and allow smaller investors to get in on portions of the investment." The website further states that "[t]he pre-IPO

investment opportunities we offer give you the opportunity to invest in high-growth companies like Uber and Airbnb before these companies go public." The website then offers to walk potential investors through "the pre-IPO venture capital opportunities available and how to get pre-IPO shares."

47.     Lachow sent hyperlinks to the PPMs, subscription agreements, purchaser questionnaires, and pre-IPO company-specific documents to potential investors by email. Lachow's emails also typically included the equivalent price per Pre-IPO Share at which the SP Fund Manager was offering Interests in a given Series.

48.     Although Lachow held himself out as the "fund manager," in reality, he was the "fund manager" in name only. Rather, Martinsen, Castillero, and Lanaia performed the SP Fund Manager's duties from behind the scenes and directed Lachow to sign documents and send emails to investors and prospective investors.

49.     If an investor wanted to invest in a Series, he or she would send back to the SP Fund Manager a completed subscription agreement, purchaser questionnaire, and their money. Certain investors also re-invested some or all of the money they made from a prior Series into a new Series.

50.     Then, if the SP Fund Manager accepted the investor into the Series (and, thus, into an SP Fund), the SP Fund Manager sent back to the investor a counter-signed signature page from the subscription agreement along with a "Welcome Letter," which the SP Fund Manager told investors to retain as "evidence of your admission as a member in [a specific Series]."

51.     The Welcome Letters stated that the relevant Series had a "beneficial interest" in a certain number of Pre-IPO Shares, stated the investor's percentage ownership of the Series, and stated the equivalent number of underlying Pre-IPO Shares (at a specific price) in which the investor had invested.

52.     Using a template, Lanaia prepared the vast majority of the Welcome Letters the SP Fund Manager sent out.  When Lanaia emailed the Welcome Letters back to investors, she often did so using Lachow's email address.

53.     Lachow himself also prepared Welcome Letters for the SP Fund Manager that were sent out to SP Fund investors.

54.     Martinsen, with assistance from Lanaia and Castillero, had primary responsibility for sourcing and acquiring Pre-IPO Shares on behalf of the SP Fund Manager.

55.     Martinsen, in consultation with Lanaia and Castillero, would then set the equivalent price per share at which the corresponding Series Interests would be sold to investors.

56.     Martinsen signed certain contracts to acquire Pre-IPO Shares on behalf of the SP Fund Manager, as did Lachow and Lanaia.

57.     When Lanaia signed these contracts, she signed as Lachow; Lanaia then corresponded with the third-parties holding the Pre-IPO Shares by email using either Lachow's email address or another "administrator" email address.

## II.     DEFENDANTS MISREPRESENTED THE NUMBER OF PRE-IPO SHARES THAT BACKED THE SERIES INTERESTS THEY SOLD

58.     Defendants overstated the number of Pre-IPO Shares that backed the Series Interests they sold to investors and in fact sold more Pre-IPO Shares than they obtained.

59.     But, rather than make good on their promises or return the money, Defendants misappropriated these funds (in their words, "overselling") and used it to pay themselves.

60.     Currently, the SP Funds have a collective shortfall of Pre-IPO Shares of at least **$14 million** across seven pre-IPO companies:

| Company | Share Deficit | Last Price Per Share Paid | Estimated Amount of Deficit |
|---|---|---|---|
| Automation Anywhere | 2,956 | $34.00 | $100,504.00 |
| Eat Just | 92,051 | $23.30 | $2,144,788.30 |
| Impossible Foods | 39,442 | $36.75 | $1,449,493.50 |
| Kraken | 75,728 | $55.00 | $4,165,040.00 |
| Rubrik | 94,818 | $39.60 | $3,754,792.80 |
| Scopely | 41,974 | $56.00 | $2,350,544.00 |
| Virgin Hyperloop | 3,354 | $2.65 | $8,888.10 |
| **Totals** | | | **$13,974,050.70** |

61.     Castillero, Martinsen, and Lanaia frequently discussed by text message the fact that the SP Fund Manager sold Series Interests in more Pre-IPO Shares than it had purchased.

62.     In a text message exchange on October 7, 2019, Martinsen, Castillero, and Lanaia discussed what to do with money that investors had sent in related to Series Interests in Pre-IPO Shares of the company Grab, which the SP Fund Manager had not yet purchased. When Lanaia noted that "[w]e don't have that much money in we can send the $ back," Martinsen responded that certain investors had already received Welcome Letters "[s]o sending the money back is not an option."

63.     In a text message exchange on August 19, 2020, Martinsen, Castillero, and Lanaia, Martinsen noted that the SP Fund Manager was "completely sold out" of Pre-IPO Shares of Impossible Foods, but then stated "[l]et's build some cash for [I]mpossible [Foods] first and then I'll find."

64.     In a text message exchange on February 2, 2021, Martinsen and one of Martinsen's contacts who helped him to source Pre-IPO Shares ("Contact A"), Martinsen stated: "This Rubrik is stressing me out. We r way oversold even on the 2 contracts with u. I need to close the open contracts and if I can get that other 5 mill that would be a life saver."

65.     In a text message exchange on March 14, 2021, Martinsen, Castillero and Lanaia discussed the fact that the SP Fund Manager had sold more Series Interests in Pre-IPO Shares of the company Eat Just.  Martinsen asked Castillero for a list of the investors who "didn't get . . . filled," noting that one investor "was sent a welcome letter in his investments that came in after we were sold out."

66.     In a text message exchange on March 22, 2021 Martinsen and Contact A, Martinsen asked: "R we getting more [eat] just???"  The next day, on March 23, 2021, after Contact A told Martinsen that the share price for Eat Just had increased, Martinsen responded.  "Let's get some.  Even if it's a small amount.  I oversold."  Martinsen then confirmed that he needed "about" $2 million worth of Eat Just Pre-IPO Shares.

67.     In a text message exchange on June 28, 2021, Martinsen, Castillero, and Lanaia discussed the fact that they had sold more Series Interests in Pre-IPO Shares of the company Kraken than they owned.  Martinsen asked "how many shares [of Kraken] did we sell at this point over what we bought?," after which Castillero and Martinsen agreed that they had oversold by 50,000 shares.

68.     The SP Fund Manager has operated at a Pre-IPO Share deficit for years.

69.     For example, between February 2, 2021 and March 8, 2021, the SP Fund Manager sold more than $25.5 million in Series Interests related to Pre-IPO Shares of the company UiPath.

70.     As Martinsen acknowledged routinely in text messages in early 2021, however, the SP Fund Manager was never on UiPath's capitalization table—the company's records of who owned its shares—and had never acquired a single UiPath Pre-IPO Share.

71.     When the SP Fund Manager was finally forced to admit that it could not acquire the UiPath Pre-IPO Shares it had promised, Martinsen, Castillero, and Lanaia urged their sales agents to convince these investors to move their investments to other pre-IPO companies.  Although some of

the investors did choose to invest in a different offering, ultimately, the SP Fund Manager had to refund more than $8 million to these investors.

72. On or about February 18, 2022, Defendants agreed, in discussions with the Commission staff, to stop soliciting new investments in Series Interests.

73. The next month, share deficits quickly became apparent.

74. Since the end of March 2022, Martinsen has transferred more than $3.3 million from his personal bank accounts into the SP Fund Manager bank account in order to cover the purchase of two blocks of Pre-IPO Shares of Rubrik.

## III.   DEFENDANTS IMPROPERLY COMMINGLED INVESTOR FUNDS AND MADE PONZI-LIKE PAYMENTS

75. Defendants repeatedly represented to investors that each Series would be "segregated" and, thus, not commingled with other Series.

76. The PPMs for each of the SP Funds stated that "[e]ach Series will remain segregated from each other Series" and that "[m]embers of a Series shall be entitled to the benefits of that particular Series only and shall not be entitled to profits, losses, allocations or distributions of any other Series of which they are not a Member." The PPMs also stated that "[d]istributions are made by the [SP] Fund on a Series-by-Series basis and not on the Fund's portfolio as a whole. Thus winners are not netted against losers."

77. The Fund Manager's public website reiterates that "[e]ach Series will remain segregated from all other Series" in response to a "Frequently Asked Question" about how investments in the SP Funds are structured.

78. But, despite these assurances, the SP Fund Manager did not segregate the SP Fund Series at all. Although each SP Fund had separate bank accounts, in practice, the SP Fund Manager did not segregate those accounts by Series. In fact, the SP Fund Manager commingled the assets of different SP Funds and commingled the assets of the SP Funds with those of the SP Fund Manager.

79.     Specifically, the SP Fund Manager commingled funds belonging to different SP

Funds in the SP Fund Manager's bank account.  On other occasions, the SP Fund Manager made

transfers directly between the SP Fund bank accounts.

80.     The SP Fund Manager used these commingled funds to purchase whatever Pre-IPO

Shares it needed across the various SP Funds.  For example:

A.     In early morning hours of June 9, 2020, Martinsen asked Castillero via text

message (on a chain that included Lanaia) if there is "anyway [sic] to get more money cleared today"

so that they could "wire what we have" to purchase Pre-IPO Shares of Impossible Foods.  Later

that day, Castillero moved a total of $608,000 into SP Fund 7 from a combination of SP Funds 2, 3,

4, 5, and 6, and used those funds (along with the funds already in the account for SP Fund 7) to pay

nearly $1.5 million for Impossible Foods Pre-IPO Shares.  Castillero then confirmed to Martinsen

and Lanaia via text message that he had sent these funds as discussed.

B.     On March 16, 2021, Lanaia transferred $11,550,780 into the SP Fund

Manager bank account from the bank accounts of SP Fund 1, 5, 6, 7, and SP Holdings.  These

amounts were funded by transfers into these bank accounts from the corresponding brokerage

accounts for these entities.  Later that day, Castillero wired $11,550,780 to purchase Pre-IPO Shares

of Scopely from the SP Fund Manager bank account.

81.     The SP Fund Manager also used commingled funds to make Ponzi-like payments

back to investors.  For example:

A.     After investors in an SP Fund 2 Series filed a fraud lawsuit against the SP

Fund Manager in November 2019, the SP Fund Manager refunded $358,000 to these investors on

January 7 and 29, 2020.  In order to fund these payments, the SP Fund Manager transferred

$308,000 into its account from SP Fund 6, $40,000 from SP Fund 2 (which was funded by new

investors in a different Series) and $10,000 from SP Fund 3.

         B.      On March 17, 2021, the SP Fund Manager transferred $1.5 million and $300,000 from the bank accounts of SP Fund 2 and SP Fund 4, respectively, to the bank account of SP Fund 8 in order to help fund a $2 million investor refund of SP Fund 8 Series Interests backed by the Pre-IPO Shares of UiPath, which the SP Fund Manager had been unable to acquire.

         C.      On July 26, 2021, Castillero transferred $1 million from an entity he controlled into the bank account of SP Fund 7. SP Fund 7 used these funds to cover a series of distributions to investors out of the account that same day and the following two days. On July 30, 2021, the SP Fund Manager transferred $1 million from SP Fund 9, first to the SP Fund Manager and then to Castillero's entity, in order to refund Castillero's $1 million payment.

         D.      On October 1, 2021, the SP Fund Manager made an investor distribution of $405,682.30 from SP Fund 3. After this distribution, SP Fund 3's bank balance turned negative in the amount of $383,772.56. On October 4, 2021, the SP Fund Manager moved $385,000 from SP Fund 7 to SP Fund 3 to cover the negative balance.

82.      Martinsen, Castillero, and Lanaia regularly discussed commingling of investor assets via text message, and each of them made such transfers over time.

83.      At times, Castillero asked Martinsen for his online bank login information so that Castillero could log in and make transfers under Martinsen's login.

84.      Neither the SP Fund Manager nor Castillero, Martinsen, or Lanaia kept records of the fees that either the SP Fund Manager or the SP Advisor purported to accrue, collect, or pay out.

85.      In fact, the general ledgers for both the SP Fund Manager and the SP Funds simply describe this type of commingling activity as "transfers" between accounts or amounts "due to/due from" these entities; they do not identify these transfers as, for example, accrued fees or other compensation owed to the SP Fund Manager or SP Adviser.

86.     Martinsen, Castillero, and Lanaia sought to identify how much they had to pay for Pre-IPO Shares and other expenses so that, as Martinsen described in a group text message on December 8, 2020, "we know what's left over for us to chop up."

87.     In total, Defendants used these commingled funds to make more than $75 million in payments to the principals—Martinsen received at least $25.4 million, Castillero received at least $24.4 million, Lanaia received at least $24.3 million, and Lachow received just under $1 million.

88.     Defendants also used these commingled funds to make nearly $48 million in payments to unregistered sales agents and more than $5.6 million more in other commission payments to broker-dealers.

89.     At times, the SP Fund Manager made these payments to its principals and sales agents by "sweeping" available funds into the SP Fund Manager's bank account from the other SP Fund bank accounts.

90.     For example, between May 18 and 22, 2020, the SP Fund Manager transferred to its own bank account a total of nearly $1.4 million from the bank accounts of SP Fund 1, SP Fund 2, SP Fund 4, SP Fund 5, SP Fund 6, and SP Fund 7.  Between May 20 and May 26, 2020, the SP Fund Manager used these funds to make payments of $255,000 to the founders ($85,000 each to Martinsen, Castillero, and Lanaia), $207,000 to sales agents, $355,300 for Pre-IPO Shares, and $570,000 to pay a refund to an investor in SP Fund 6.

91.     Similarly, on June 11, 2021, the SP Fund Manager "swept" more than $1.6 million into its bank account from SP Funds 4, 5, 7, and 8.  The same day, the SP Fund Manager used those funds to make three $500,000 payments to Martinsen, Castillero, and Lanaia, as well as $140,000 in payments to various sales agents.

IV.   **DEFENDANTS CHARGED EXCESSIVE HIDDEN MARKUPS THROUGH UNDISCLOSED PRINCIPAL TRANSACTIONS**

92.   According to the PPMs and operating agreements, the SP Fund Manager could charge investors certain upfront fees—a management fee (of up to 2 percent), an expense fee (of up to 1 percent), and a due diligence fee (of up to 5 percent).

93.   The SP Fund Manager's website also references these same three fees in the response to a "Frequently Asked Question" that asks "[w]hat are the investment banking fees?"

94.   The PPMs also state that the SP Fund Manager and/or the SP Adviser could charge a "marketing or placement fee" of up to 10 percent.

95.   In practice, however, the SP Fund Manager told investors that it had waived all of these upfront fees.

96.   For example, the Welcome Letters for investors that were recruited by many of the sales agents stated that no management fee, no expense fee, and no due diligence fee were deducted from an investor's capital contribution to the SP Fund.  These Welcome Letters also made no reference to a marketing or placement fee.

97.   And, in some cases, the SP Fund Manager went even further, sending side letters to investors specifically confirming for them that it would not be charging any upfront fees at all.

98.   Lanaia was typically the person who drafted and sent these upfront fee side letters, though they were signed by either Lachow or Martinsen.

99.   In reality, however, the SP Fund Manager charged high upfront fees in the form of an undisclosed markup—that is, the difference between the price the SP Fund Manager paid for the Pre-IPO Shares and the price at which the SP Fund Manager sold corresponding Series Interests to investors.

100.   Defendants used this markup to pay upfront fees to their unregistered sales agents, and Martinsen, Castillero, and Lanaia then pocketed the remainder.

101.   In 2021, as the SP Fund Manager faced Pre-IPO Share deficits across multiple Series, these markups increased as did the payments to the founders.

102.   Beginning in June 2021, the SP Fund Manager charged markups of 57 percent for Pre-IPO Shares of Automation Anywhere—that is, it sold Series Interests at a price equivalent to $41 per share when it had purchased the Pre-IPO Shares at $26.10 per share.

103.   In November 2021, the SP Fund Manager purchased another block of Automation Anywhere Pre-IPO Shares, this time at $34 per share, to cover a portion of a share deficit where it had been selling Series Interests at a price that was equivalent to as high as $50 per share (a 47 percent markup).

104.   Between May 2021 and January 2022, the SP Fund Manager routinely sold Series Interests in Kraken Pre-IPO Shares at a price equivalent of $90 per share.  The SP Fund Manager bought these shares at prices between $47 (a 91 percent markup) and $55 (a 64 percent markup) per share.

105.   By at least June 2021 and up through February 2022, the SP Fund Manager sold Series Interests in Plaid Pre-IPO Shares at a price equivalent of $1,600 per share.  The SP Fund Manager bought these shares at prices between $900 (a 78 percent markup) and $970 (a 65 percent markup) per share.

106.   And, between July 2021 and February 2022, the SP Fund Manager sold Series Interests in Triller Pre-IPO Shares at a markup of 100 percent or more.

107.   Martinsen's recent purchases of Rubrik Pre-IPO Shares to cover parts of the share deficit were at a price of $39.60 per share.  Between October and December 2021, however, the SP Fund Manager had been charging investors a price equivalent of $65 per share.  In essence, the SP Fund Manager was selling Series Interests in Pre-IPO Shares *it did not have* at a 64 percent markup.

108.    All the while, the three founders continued to line their own pockets.  Between

January 2021 and February 2022, they paid themselves a total of over $56 million.

109.    Though the PPMs stated that "StraightPath Affiliates may, to the extent permissible

by law, receive income from [markups]" that would not be shared with the SP Funds, this statement

was false and misleading because, in reality, the SP Fund Manager's practice was *always* to charge a

markup on *every* sale of Series Interests.

110.    Moreover, these markups were not "permissible by law" because they were principal

transactions that, pursuant to Section 206(3) of the Advisers Act, required notice and written

consent from the affected investors.

111.    The SP Fund Manager sold the Pre-IPO Shares it acquired to the SP Funds as

principal (i.e., its own account), and the lion's share of these markups flowed through the SP Fund

Manager to its owners, Martinsen, Castillero, and Lanaia, each of whom served as an investment

adviser to the SP Funds through their ownership and/or work for the SP Advisor.

112.    Defendants never made the required disclosure of these principal transactions or

received the required written consent from the SP Fund investors.

113.    Neither the Welcome Letters nor any other communications to investors disclosed

these markups or the advisers' role in the transactions.

114.    Similarly, the Forms D that the SP Funds filed with the Commission also failed to

disclose these hidden fees.

115.    Even the side letters failed to disclose these fees and the amount of the markup.

116.    For example, a side letter signed by Lachow dated September 29, 2020, for an

investor in an Impossible Foods Series advised that "[t]his letter is to certify and confirm that there

are no upfront fees" and that SP Fund 8 will charge the fees listed in the PPM.  In reality, the SP

Fund Manager charged this investor a markup of 46 percent, 18 percent of which it paid to an unregistered sales agent.

117.    A side letter signed by Martinsen dated June 18, 2021, for an investor in a Triller Series advised that the letter "is to certify and confirm that there are no up front [sic] fees" and that SP Fund 7 will not charge the fees listed in the PPM.  In reality, the SP Fund Manager charged this investor a markup of 78 percent, 18 percent of which it paid to an unregistered sales agent.

## V.    THE OFFERINGS OF SERIES INTERESTS IN THE SP FUNDS VIOLATED THE SECURITIES OFFERING REGISTRATION PROVISIONS

118.    Securities Act Section 5 [15 U.S.C. § 77e] makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale.

119.    None of the Series Interests sold by Defendants were sold pursuant to a registration statement filed with the Commission.

120.    Defendants purported to offer the Series Interests on the basis of Rule 506(c) of Regulation D [17 C.F.R. § 230.506(c)], a Commission regulation that provides a safe-harbor registration exemption under Securities Act Section 4(a)(2) for qualifying private offerings.

121.    In order to qualify for the Rule 506(c) safe-harbor, all purchasers of the securities sold must be "accredited investors"—that is, for example, individual investors who had a net worth (with their spouse) of more than $1 million or annual income exceeding $200,000 or joint income exceeding $300,000.  17 C.F.R. §§ 230.501(a)(5), (a)(6).  In addition, the issuer of the securities must take reasonable steps to verify that the purchasers of the securities are accredited investors, which may include reviewing documentation such as tax records and brokerage or bank account statements.  17 C.F.R. § 230.506(c)(2)(ii).

122.     Neither the SP Funds individually, nor the SP Fund Manager or SP Adviser on their behalf, took such reasonable steps with respect to the overwhelming majority of the Series Interests they sold to investors.

123.     The vast majority of the investments in the SP Funds were solicited by unregistered sales agents.

124.     For these investors, Defendants did little more than collect signed purchaser questionnaire—that is, self-certifications—concerning whether the investor qualified as an accredited investor.

125.     Defendants did not verify these claims by collecting any of the types of documents identified in Rule 506(c)(2)(ii).

126.     Moreover, Defendants were not entitled to rely on the Rule 506(c) safe-harbor for the vast majority of their sales of Series Interests because of Castillero and Lanaia's roles in these securities offerings during periods of time that they were either barred or suspended from association with any FINRA member.  17 C.F.R. § 230.506(d)(1)(vi).

127.     Between January 16, 2018, and April 15, 2018, during which time Lanaia was suspended from association with any FINRA member, Defendants sold more than $1.1 million in Series Interests across the SP Funds.

128.     Since February 6, 2019, the date Castillero was barred by FINRA, Defendants sold more than $376 million in Series Interests across the SP Funds, plus an additional $22.8 million in Series Interests from re-investments of monies earned from prior Series.

## VI.     STRAIGHTPATH'S SALES EFFORTS VIOLATED THE BROKER-DEALER REGISTRATION PROVISIONS

129.     Exchange Act Section 15(a)(1) makes it unlawful for any broker or dealer "to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security" unless such broker or dealer is registered with the Commission.  15 U.S.C. § 78o(a)(1).

130.     Defendants violated these provisions by hiring, training, and running a vast sales network to sell the Series Interests, to which it paid commissions typically generated by the undisclosed markups they charged the SP Funds for Pre-IPO Shares.  Martinsen, Castillero, and Lanaia then kept the remaining pieces of these markups for themselves.

131.     Defendants sold Series Interests through a vast network of sales people, which included more than 100 sales agents and at least three Commission-registered brokerage firms.

132.     Castillero and Lachow recruited the agents in part over Craigslist.  In one case, Lachow responded to a post entitled "***PHONE SALES***NO EXPERIENCE NEEDED***" with an invitation to discuss a sales agent position with the SP Fund Manager.  Lachow stated that the position would involve selling "stock in late stage multi-billion companies."  Lachow added, "We will provide your office with all of the support and training that you need to position you for continuous success."

133.     Castillero had primary responsibility for managing these sales agents.

134.     Many of these sales agents made cold calls to potential investors using lead lists and sales scripts provided by Castillero.

135.     Over time, the SP Fund Manager ran "boiler rooms," or makeshift offices used to solicit investors, located in this District, elsewhere in New York, New Jersey, and Florida.

136.     Castillero provided many of these sales agents with email addresses and business cards that identified them as employees of the SP Fund Manager.  In reality, these sales agents were not employees of the Fund Manager at all.

137.     The sales agents Defendants used were not licensed or associated with registered brokerage firms.  In fact, some of these sales agents previously had been barred from working as securities brokers by FINRA or the Commission, or had otherwise been disciplined by other federal or state agencies.

138.     Martinsen, Castillero, and Lanaia knew, or were reckless in not knowing, that the sales agents they recruited to sell securities for the SP Fund Manager were not associated with a registered broker at the time of those sales.

139.     Nevertheless, the SP Fund Manager paid these unregistered sales agents commissions—that is, a percentage of the amounts of money they raised for the SP Funds.

140.     Generally, the SP Fund Manager paid these sales agents an upfront commission of 10percent of the fund invested by the investor that the sales agent either solicited or referred, though this upfront commission was, in some cases, as high as 18 percent.

141.     The SP Fund Manager also typically agreed to pay these sales agents 10 percent of the investor's "back-end carried interest"—that is, the profit on the Pre-IPO Shares after an IPO.

142.     The SP Fund Manager documented these commission agreements with is unregistered sales agent using standardized agreements called "Referral Agent Agreements."

143.     Castillero and Lanaia typically drafted the Referral Agent Agreements.

144.     At various times, either Lachow, Martinsen, Castillero, and Lanaia (on Lachow's behalf) signed the Referral Agent Agreements on behalf of the SP Fund Manager.

145.     Castillero, with assistance from Martinsen, Lanaia, and Lachow, recruited the network of unregistered sales agents who worked for the SP Fund Manager.

146.     Though Lachow held himself out as an executive at the SP Fund Manager and/or the SP Adviser, he was also an unregistered sales agent himself.

147.     Lachow had a Referral Agent Agreement that provided for the payment of an upfront cash commission of 15 percent along with 10 percent of the back-end carried interest.

148.     Between September 2020 and December 2021, Lachow solicited investments in Series Interests from at least 29 investors, which totaled at least $3.7 million.

149.     The SP Fund Manager paid Lachow commissions on the investments he solicited.

150.    Overall, between December 2017 and April 2022, the Fund Manager paid a total of nearly $48 million in commissions to these unregistered sales agents.

151.    Although Lanaia and Castillero were barred by FINRA in 2018 and 2019, respectively, after they were barred, they both continued to participate in the offerings of Series Interests and their duties remained largely unchanged.

152.    After being barred, Castillero continued to manage the SP Fund Manager's sales force, which solicited investments in the Interests, after he was barred in February 2019 through at least February 2022.

## VII.    CASTILLERO AND MARTINSEN DELETED SUBPOENAED EMAILS

153.    On November 12, 2020, the Commission staff issued an investigative subpoena to SP Holdings and its affiliates, including SP Fund Manager and the SP Adviser (the "Subpoena").

154.    Among other things, the Subpoena sought production of documents and communications concerning "all finders, marketers, consultants, or other third parties utilized by [SP Holdings, as defined in the subpoena] to identify investors." The Subpoena also sought email communications concerning "investors in investment vehicles with holdings of securities of Palantir and Lyft."

155.    The subpoena directed the recipients to respond by no later than November 27, 2020.

156.    The Commission staff served the subpoena by email, sending it to Martinsen's email address at the SP Fund Manager.

157.    As of April 14, 2021, SP Fund Manager and SP Adviser still had not fully responded to the Subpoena.

158.    That day, the Commission staff wrote Martinsen an email identifying deficiencies in the production and requesting that the documents be produced by a particular date ("April 14th Email").

159.    Among other things, Commission staff specifically requested the production of certain email communications responsive to the Subpoena: "By **May 5,** please produce all communications (including emails and text messages) with the below individuals and/or entities during the Relevant Period (defined in the subpoena as January 1, 2018 to the present).  If the individuals and/or entity was provided a StraightPath email address, please also produce their emails."  The list contained the names of ten sales agents the Commission staff understood had been issued StraightPathVP.com email addresses ("Request #1").  An additional nearly identical request was made for an additional 37 sales agents with a due date of May 19 ("Request #2").

160.    By May 1, 2021, Castillero had begun to contact sales agents who had been using StraightPathVP.com email addresses and informed them that they would no longer have access to these email addresses.

161.    That same day, Castillero discussed the sales agent emails with Martinsen by text message.  Martinsen privately admitted in this discussion that certain sale agent emails "put[ ] us at risk."  Castillero agreed, writing "[a]n asshole regulator would have a field day" with these emails.

162.    On May 5, 2021, the date Commission staff told Martinsen that communications (including email) with the first ten sales agents were due,  Martinsen confided in Castillero by text message: "We r going to claim they they [sic] don't have emails and we don't.  Have archives . . . "Just delete there [sic] emails.  Fuck it."

163.    That same day, Castillero deleted email accounts belonging to eight different sales agents, including Sales Agents A, B, C, and D.

164.     Also that same day, Martinsen, on behalf of SP Fund Manager, wrote Commission staff a letter stating: "Please be advised that those listed [including Sales Agents A, B, C, and D] do not have SPVP Email addresses.  Be further advised that StraightPath Venture Partners does not keep archived emails."

165.     On May 21, 2021, Martinsen submitted a letter to Commission staff responding in detail to the April 14th Email writing in response to Request #1, "As previously stated, these emails do not currently exist and our service provider . . . does not archive the emails."  In response to Request #2 in the April 14th Email, Martinsen wrote, "[P]lease be advised that we have previously indicated those individuals or entities we have not had an email address and I will indicate below those who have had an email in the past.  Again, we do not archive emails and our service provider . . . does not archive the emails."

166.     After Martinsen's email on May 21, 2021, Castillero continued to delete additional email accounts, including sales agent email accounts, in at least June, August, September, October, and November 2021.

## VIII.   THE SP ADVISER MADE MISREPRESENTATIONS IN ITS FORMS ADV

167.     A Form ADV is a uniform form used by investment advisers to register with the SEC and state securities authorities.  Completed Forms ADV are available to the public.

168.     The SP Adviser made misrepresentations in its Forms ADV about the SP Funds' fund administrator and auditor.

169.     For example, the SP Adviser's Forms ADV listed Administrator A as its outside administrator beginning in August 2018.

170.     Administrator A, however, resigned from its role as fund administrator by at least May 2019.

171.     Nonetheless, the SP Adviser continued to list Administrator A on the SP Adviser's Forms ADV until September 2021.

172.     Additionally, the SP Adviser listed Auditor A as its auditor in its Forms ADV beginning in January 2019.

173.     Auditor A was never engaged, however, and the SP Adviser never retained a different auditor.

174.     The SP Adviser's Forms ADV continue to list Auditor A as its auditor.

175.     Defendants provided these Forms ADV to registered broker-dealers that solicited investors in the SP Funds and certain prospective investors.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

176.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

177.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

178.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Martinsen, Castillero, Lanaia, and Lachow)

179.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

180.    The SP Fund Manager and the SP Adviser violated Securities Act Section 17(a) in the offer or sale of the Series Interests.

181.    Specifically, SP Fund Manager and the SP Adviser, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

182.    Martinsen, Castillero, Lanaia, and Lachow knowingly or recklessly provided substantial assistance to the SP Fund Manager's and the SP Adviser's violations.

183.    By reason of the foregoing, Martinsen, Castillero, Lanaia, and Lachow are liable for aiding and abetting the SP Fund Manager's and the SP Adviser's violations of Securities Act 17(a).

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

184.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

185.     Defendants, directly or indirectly, singly or in concert, in connection with the

purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or

the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed

one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a

material fact or omitted to state one or more material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, and/or

(iii) engaged in one or more acts, practices, or courses of business which operated or would operate

as a fraud or deceit upon other persons.

186.     By reason of the foregoing, Defendants directly or indirectly, singly or in concert,

have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Martinsen, Castillero, Lanaia, and Lachow)**

187.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 175.

188.     The SP Fund Manager and the SP Adviser violated Exchange Act Section 10(b) and

Rule 10b-5 thereunder in connection with the sale of the Series Interests.

189.     Specifically, the SP Fund Manager and the SP Adviser, directly or indirectly, singly or

in concert, in connection with the purchase or sale of securities and by the use of means or

instrumentalities of interstate commerce, or the mails, or the facilities of a national securities

exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to

defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more

material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or

courses of business which operated or would operate as a fraud or deceit upon other persons.

190.     Martinsen, Castillero, Lanaia, and Lachow knowingly or recklessly provided

substantial assistance to the SP Fund Manager's and the SP Adviser's violations.

191.     By reason of the foregoing, Martinsen, Castillero, Lanaia, and Lachow are liable for

aiding and abetting the SP Fund Manager's and the SP Adviser's violations of Exchange Act 10(b)

and Rule 10b-5 thereunder.

## FIFTH CLAIM FOR RELIEF
### Advisers Act Section 206 and Rule 206(4)-8 Thereunder
### (SP Adviser, Martinsen, Castillero, Lanaia, and Lachow)

192.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 175.

193.     The SP Adviser, Martinsen, Castillero, Lanaia, and Lachow had an adviser-client

relationship with and therefore owed a fiduciary duty to the SP Funds.

194.     From at least 2017 to the present, while acting as an investment adviser, the SP

Adviser, Martinsen, Castillero, Lanaia, and Lachow, by use of the mails or any means or

instrumentality of interstate commerce, directly or indirectly, (i) employed a device, scheme, or

artifice to defraud a client or prospective client; (ii) engaged in transactions, practices, or courses of

business that operated as a fraud or deceit upon a client or prospective client; (iii) acting as principal

for their own account, knowingly sold securities to a client, without disclosing to such client in

writing before the completion of such transaction the capacity in which they were acting and

obtaining the consent of the client to such transaction; and/or (iv) engaged in any act, practice, or

course of business which is fraudulent, deceptive, or manipulative.

195.    By reason of the foregoing, the SP Adviser, Martinsen, Catillero, Lanaia, and Lachow directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(1), 206(2), 206(3), and 206(4) and Rule 206(4)-8 thereunder.

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Advisers Act Section 206 and Rule 206(4)-8 Thereunder**
**(SP Fund Manager, Martinsen, Castillero, Lanaia, and Lachow)**

196.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

197.    The SP Adviser violated Sections 206(1), 206(2), 206(3), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder in connection with the sale of the Series Interests.

198.    Specifically, while acting as an investment adviser, the SP Adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (i) employed a device, scheme, or artifice to defraud a client or prospective client; (ii) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon a client or prospective client; (iii) acting as principal for their own account, knowingly sold securities to a client, without disclosing to such client in writing before the completion of such transaction the capacity in which they were acting and obtaining the consent of the client to such transaction; and/or (iv) engaged in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.

199.    The SP Fund Manager, Martinsen, Castillero, and Lanaia knowingly or recklessly provided substantial assistance to the SP Adviser's violation.

200.    As a result of the forgoing, the SP Fund Manager, Martinsen, Castillero, and Lanaia are liable for aiding and abetting the SP Adviser's violations of Advisers Act Section 206 and Rule 206(4)-8 thereunder.

### SEVENTH CLAIM FOR RELIEF
**Advisers Act Section 207**
**(SP Adviser, Martinsen, Castillero, Lanaia, and Lachow)**

201.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

202.     The SP Adviser, Martinsen, Castillero, Lanaia, and Lachow, while acting as an investment advisers, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, willfully made untrue statements material fact in a registration application or report filed with the Commission under section 80b–3 or 80b–4 of this title, or willfully to omitted to state in any such application or report any material fact which is required to be stated therein.

203.     By reason of the foregoing, the SP Adviser, Martinsen, Catillero, Lanaia, and Lachow directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 207.

### EIGHTH CLAIM FOR RELIEF
**Advisers Act Section 207**
**(SP Fund Manager, Martinsen, Castillero, Lanaia, and Lachow)**

204.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

205.     The SP Adviser violated Advisers Act Section 207.

206.     Specifically, the SP Adviser, while acting as an investment advisers, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, willfully made untrue statements material fact in a registration application or report filed with the Commission under section 80b–3 or 80b–4 of this title, or willfully to omitted to state in any such application or report any material fact which is required to be stated therein.

207.     The SP Fund Manager, Matinsen, Castillero, and Lachow knowingly or recklessly substantially assisted the SP Adviser's violation.

208.    By reason of the foregoing, the SP Fund Manager, Martinsen, Castillero, Lanaia are

liable for aiding and abetting violate the SP Adviser's violations of Advisers Act Section 207.

## NINTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and (c)
### (All Defendants)

1.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 175.

2.    From 2017 until the present, Defendants, directly or indirectly, and notwithstanding

the fact that there was no applicable exemption: (a) made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to sell, through the use or

medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

(b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in

interstate commerce, by means or instruments of transportation, securities as to which no

registration statement was in effect; and/or (c) made use of means or instruments of transportation

or communication in interstate commerce or of the mails to offer to sell, through the use or medium

of a prospectus or otherwise, securities as to which no registration statement had been filed.

3.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert,

have violated and, unless enjoined, will again violate Securities Act Sections 5(a) and (c).

## TENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 5(a) and (c)
### (Martinsen, Castillero, Lanaia, and Lachow)

4.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 175.

5.    The SP Adviser and SP Fund Manager violated Securities Act Sections 5(a) and (c).

6.    Specifically, from 2017 until the present, the SP Adviser and SP Fund Manager,

directly or indirectly, and notwithstanding the fact that there was no applicable exemption: (a) made

use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

7.      Martinsen, Castillero, Lanaia, and Lachow knowingly or recklessly provided substantial assistance to the SP Adviser and the SP Fund Manager in the forgoing conduct.

8.      By reason of the foregoing, Martinsen, Castillero, Lanaia, and Lachow are liable for aiding and abetting the SP Adviser and the SP Fund Manager's violations of Securities Act Sections 5(a) and (c).

**ELEVENTH CLAIM FOR RELIEF**
**Violations of Exchange Act Sections 15(a)**
**(All Defendants)**

9.      The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

10.     Defendants, while not registered with the Commission as a broker or dealer or associated with a registered broker or dealer, made use of the mails or other means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities other than exempted securities or commercial paper, bankers' acceptances, or commercial bills.

11.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 15(a)(1).

## TWELFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 15(a) of the Exchange Act
### (Martinsen, Castillero, and Lanaia)

12.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 175.

13.     Lachow violated Exchange Act Section 15(a)(1).

14.     Specifically, Lachow, while not registered with the Commission as a broker or dealer or associated with a registered broker or dealer, made use of the mails or other means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities other than exempted securities or commercial paper, bankers' acceptances, or commercial bills.

15.     Martinsen, Castillero, and Lanaia knowingly and recklessly provided substantial assistance to Lachow's violations.

16.     By reason of the foregoing, Martinsen, Castillero, and Lanaia are liable for aiding and abetting the SP Fund Manager and Lachow's violations of Exchange Act Section 15(a)(1).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter:

### I.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining Defendants, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Advisers Act Sections 206(1), 206(2), 206(3), 206(4), and 207 [15 U.S.C. §§ 80b-6(1), (2), (3), and (4), 80b-7] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].;

**II.**

An Order temporarily and preliminarily, through a Final Judgment, freezing the assets of the SP Fund Manager, the SP Adviser, Martinsen, Castillero, and Lanaia;

**III.**

An Order temporarily and preliminarily, through a Final Judgment, appointing a receiver over the SP Funds, the SP Fund Manager, the SP Adviser, and the personal assets of Martinsen, Castillero, and Lanaia;

**IV.**

An Order temporarily and preliminarily, through a Final Judgment, enjoining the filing of any bankruptcy, foreclosure, receivership, or other actions against the SP Funds, the SP Fund Manager, and the SP Adviser;

**V.**

An Order requiring the SP Fund Manager, the SP Adviser, Martinsen, Castillero, and Lanaia to submit a verified accounting of their assets and the use of all investor funds raised by the SP Fund Manager, the SP Adviser, and the SP Funds;

**VI.**

An Order temporarily and preliminarily, through the Court's decision on the Commission's application for a preliminary injunction, permitting expedited discovery;

**VII.**

An Order temporarily, and preliminarily, through a Final Judgment, enjoining Defendants and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission or the receiver to relevant documents, books and records;

**VIII.**

A Final Judgment ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)];

## IX.

A Final Judgment ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

## X.

A Final Judgment granting any other and further relief this Court may deem just and proper.

Dated:  May 13, 2022
       New York, New York

                                       /s/ Lara S. Mehraban
                                       LARA S. MEHRABAN
                                       ACTING REGIONAL DIRECTOR
                                       Sheldon L. Pollock
                                       Steven G. Rawlings
                                       Lee A. Greenwood
                                       Philip A. Fortino
                                       Megan R. Genet
                                       Attorneys for Plaintiff
                                       SECURITIES AND EXCHANGE COMMISSION
                                       New York Regional Office
                                       100 Pearl Street, Suite 20-100
                                       New York, New York 10004
                                       212-336-1060 (Greenwood)
                                       GreenwoodL@sec.gov